**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

JAMAL BELTON,                        :
                                     :   Civil Action No. 10-6462 (SDW)
        Plaintiff,       :
                                     :
                                     :
        v.               :   **OPINION**
                                     :
MARK SINGER, et al.,                 :
                                     :
        Defendants.      :   July 8, 2011


**APPEARANCES:**

    JAMAL BELTON, Plaintiff pro se
    #000420
    East Jersey State Prison, Special Treatment Unit
    CN 905, 8 Production Way
    Avenel, New Jersey 07001

**WIGENTON**, District Judge

    Plaintiff, Jamal Belton, an involuntarily committed person pursuant to the Sexually Violent Predator Act ("SVPA"), N.J.S.A. 30:4-27.24, et seq., seeks to bring this action in forma pauperis. Based on his affidavit of indigence, the Court will grant plaintiff's application to proceed in forma pauperis ("IFP") pursuant to 28 U.S.C. § 1915(a) (1998) and order the Clerk of the Court to file the Complaint.

    At this time, the Court must review the Complaint, pursuant to 28 U.S.C. § 1915(e)(2), to determine whether the action should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks

monetary relief from a defendant who is immune from such relief. For the reasons set forth below, the Court concludes that this action should be dismissed for failure to state a claim.

I.   <u>BACKGROUND</u>

Plaintiff, Jamal Belton ("Belton"), brings this civil rights action, pursuant to 42 U.S.C. § 1983, against the following defendants: Mark Singer, Deputy Attorney General for the State of New Jersey; David L. DaCosta, Deputy Attorney General for the State of New Jersey; John Main, Chief Director of the New Jersey Department of Human Services ("NJDHS") at the Ann Klein Forensic Center in Trenton, New Jersey; Dr. Merril Main, Clinical Director at East Jersey State Prison-Special Treatment Unit ("EJSP-STU"); Jennifer Velez, Commissioner of the NJDHS; Steve Johnson, Assistant Superintendent at EJSP-STU; Shantay Brame Adams, Assistant Unit Director at the EJSP-STU; and Brian Friedman, Director of Psychology at the EJSP-STU.  (Complaint, Caption and ¶¶ 4b-4i).  The following factual allegations are taken from the Complaint, and are accepted for purposes of this screening only. The Court has made no findings as to the veracity of plaintiff's allegations.

This is the second Complaint Belton has filed with respect to the same and/or similar claims.  His first action, <u>Belton v. Sharpe, et al.</u>, Civil No. 10-3071 (SDW), was dismissed without prejudice in an Opinion and Order entered by this Court on

November 29, 2010.  The instant Complaint was filed on or about December 13, 2010.

In this Complaint, Belton alleges that defendants, Mark Singer and Jennifer Velez, have overlooked and disregarded that plaintiff is a civilly committed person being housed on prison grounds and subjected to prison policies and treatment conducted or facilitated by the New Jersey Department of Corrections ("NJDOC") rather than the NJDHS.  (Compl., ¶¶ 4b, 4h).  Plaintiff complains that David L. DaCosta failed to oversee and correct the conditions of the EJSP-STU and overlooked plaintiff's complaints that the correctional staff is "mentally humiliating" plaintiff because of his crime and life gender.  (Compl., ¶ 4c).

Next, Belton alleges that John Main has failed to correct the conditions of the facility, namely, leaking ceilings, toilets and water that gives a rash.  He also alleges that Main has not corrected the problem of having NJDOC staff conduct "treatment movements" that cancels groups when they are still in session.  (Compl., ¶ 4d).  Belton states that defendant Merril Main has authorized the NJDOC to limit group sessions and segregate population causing plaintiff to be taken out of his former groups without regard to his therapy needs by submitting plaintiff's name to a test called the "hair scope psychopathy test."  (Compl., ¶ 4e).

3

Belton further alleges that defendant Johnson has placed plaintiff under prison policy, rules and regulations, which has caused Belton to be "mentally harassed and degraded" by correctional staff and to be taken out of recommended therapy groups by enforcing a segregation policy.  (Compl., ¶ 4f). Defendant Adams allegedly has authorized and approved the NJDOC to harass and confiscate plaintiff's personal belongings, and has overlooked correctional staff canceling or interfering with therapy groups when the session is not over.  (Compl., ¶ 4g). Finally, as to defendant Friedman, Belton complains that Friedman also has overlooked the mental harassment by correctional staff when they conduct the running of therapy sessions.  (Compl., ¶ 4i).

Specifically, Belton alleges that, on May 19, 2010, he observed the NJDHS staff psychiatrists, psychologists and social workers moving their office supplies off grounds to a location in Edison, New Jersey, leaving plaintiff with no on-site psychiatrist after 4:00 p.m.  (Compl., ¶ 6).  He further alleges that he has received two memos giving different addresses for mailing and receipt of mail other than the EJSP-STU location where he is housed.  (Id.).

On October 8, 2010, a bed bug exterminator came to the EJSP-STU, and came every weekday to fumigate the units for bed bug infestation.  Belton alleges that the correctional staff

4

constantly cancels therapy sessions, conducts unit searches, and interferes with the "running of groups."  He states that, on October 21, 2010, he overheard Sgt. Smith telling another officer that "that's what happens when a celebrity is on the unit." Belton brought this to defendant Adams attention, but she merely stated that this is NJDOC policy.  (Id.).

On November 1, 2010, Belton states that he received a memo that his electronics would no longer be permitted.  He states that he was told that if he complained, his electronic equipment would be confiscated for a year with an appeal.  He provides a copy of the memo, which includes memory sticks, flash drives, thumb drives, detachable or external drives, data storage devices, X-Box Elite, PS 3 (Play Station 3), Wii, and remote controls with digital read-out or viewing screens.  The memo states that these electronic devices compromise the security and orderly running of the institution.  The memo further states that any resident who "attempts to circumvent the electronics policy ... will lose electronic privileges permanently with an appeal after one year."  (See November 1, 2010 Interoffice Communication Memo attached to Complaint).  Belton alleges that this memo shows that he is being placed under full prison policies and guidelines disregarding the fact that he is not serving a prison term. Further, Belton alleges that he was told by Johnson that residents at EJSP-STU are under the "10A- Code" instead of the

civilly committed act, causing the residents to be subjected to strip searches, cell searches and random shakedowns, and the confiscation of electronic equipment.  (Compl., ¶ 6).

Belton also makes general allegations that therapy groups are conducted by the NJDOC "movements", causing plaintiff to be taken out of therapy groups that he had attended previously, or causing the session to be cancelled before it is over.  He states that on November 23, 2010, he "constantly complain[ed]" about this problem but never receives a response to his grievances. (Id.).

On September 16, 2010, Belton alleges that Friedman admitted that plaintiff is in an "untherapeutic environment" and that treatment is "futile" because of the prison setting and because the NJDHS does not have the money to give proper treatment and housing.  (Id.).

On November 27, Belton complains that he was strip searched after his "p.m. visits."  (Id.).

Belton asks to be placed in a federally funded treatment facility.  He also seeks monetary compensation for being placed in a prison environment where he has suffered mental anguish, harassment, and discrimination.  (Compl., ¶ 7).

II.  <u>STANDARDS FOR A SUA SPONTE DISMISSAL</u>

A district court is required to review a complaint in a civil action where the litigant is proceeding <u>in</u> <u>forma</u> <u>pauperis</u>. Specifically, the court is required to identify cognizable claims and to <u>sua</u> <u>sponte</u> dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief, pursuant to 28 U.S.C. § 1915(e)(2)(B).  Accordingly, because Belton is proceeding <u>in</u> <u>forma</u> <u>pauperis</u> in this matter, this action is subject to <u>sua</u> <u>sponte</u> screening for dismissal under 28 U.S.C. § 1915(e)(2)(B).

In determining the sufficiency of a <u>pro</u> <u>se</u> complaint, the Court must be mindful to construe it liberally in favor of the plaintiff.  <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 93-94 (2007)(following <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976) and <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972)).  <u>See also</u> <u>United States v. Day</u>, 969 F.2d 39, 42 (3d Cir. 1992).  The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."  <u>Morse v. Lower Merion School Dist.</u>, 132 F.3d 902, 906 (3d Cir. 1997).  The Court need not, however, credit a <u>pro</u> <u>se</u> plaintiff's "bald assertions" or "legal conclusions."  <u>Id.</u>

A complaint is frivolous if it "lacks an arguable basis either in law or in fact."  <u>Neitzke v. Williams</u>, 490 U.S. 319,

325 (1989) (interpreting the predecessor of § 1915(e)(2), the former § 1915(d)).  The standard for evaluating whether a complaint is "frivolous" is an objective one.  Deutsch v. United States, 67 F.3d 1080, 1086-87 (3d Cir. 1995).

A pro se complaint may be dismissed for failure to state a claim only if it appears "'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Haines, 404 U.S. at 521 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  See also Erickson, 551 U.S. at 93-94 (In a pro se prisoner civil rights complaint, the Court reviewed whether the complaint complied with the pleading requirements of Rule 8(a)(2)).

However, recently, the Supreme Court revised this standard for summary dismissal of a Complaint that fails to state a claim in Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009).  The issue before the Supreme Court was whether Iqbal's civil rights complaint adequately alleged defendants' personal involvement in discriminatory decisions regarding Iqbal's treatment during detention at the Metropolitan Detention Center which, if true, violated his constitutional rights.  Id.  The Court examined Rule 8(a)(2) of the Federal Rules of Civil Procedure which provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

Fed.R.Civ.P. 8(a)(2).[1]  Citing its recent opinion in Bell
Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), for the
proposition that "[a] pleading that offers 'labels and
conclusions' or 'a formulaic recitation of the elements of a
cause of action will not do,' "Iqbal, 129 S.Ct. at 1949 (quoting
Twombly, 550 U.S. at 555), the Supreme Court identified two
working principles underlying the failure to state a claim
standard:

>    First, the tenet that a court must accept as true all of the
>    allegations contained in a complaint is inapplicable to
>    legal conclusions.  Threadbare recitals of the elements of a
>    cause of action, supported by mere conclusory statements, do
>    not suffice ... .  Rule 8 ... does not unlock the doors of
>    discovery for a plaintiff armed with nothing more than
>    conclusions.  Second, only a complaint that states a
>    plausible claim for relief survives a motion to dismiss.
>    Determining whether a complaint states a plausible claim for
>    relief will ... be a context-specific task that requires the
>    reviewing court to draw on its judicial experience and
>    common sense.  But where the well-pleaded facts do not
>    permit the court to infer more than the mere possibility of
>    misconduct, the complaint has alleged-but it has not
>    "show[n]"-"that the pleader is entitled to relief."  Fed.
>    Rule Civ. Proc. 8(a)(2).

Iqbal, 129 S.Ct. at 1949-1950 (citations omitted).

The Court further explained that

>    a court considering a motion to dismiss can choose to begin
>    by identifying pleadings that, because they are no more than
>    conclusions, are not entitled to the assumption of truth.
>    While legal conclusions can provide the framework of a
>    complaint, they must be supported by factual allegations.
>    When there are well-pleaded factual allegations, a court
>    should assume their veracity and then determine whether they
>    plausibly give rise to an entitlement to relief.

---

[1]  Rule 8(d)(1) provides that "[e]ach allegation must be
simple, concise, and direct.  No technical form is required."
Fed.R.Civ.P. 8(d).

<u>Iqbal</u>, 129 S.Ct. at 1950.

Thus, to prevent a summary dismissal, civil complaints must now allege "sufficient factual matter" to show that a claim is facially plausible.  This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id</u>. at 1948.  The Supreme Court's ruling in <u>Iqbal</u> emphasizes that a plaintiff must demonstrate that the allegations of his complaint are plausible.  <u>Id</u>. at 1949-50; <u>see also</u> <u>Twombly</u>, 505 U.S. at 555, & n.3; <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210(3d Cir. 2009).

Consequently, the Third Circuit observed that <u>Iqbal</u> provides the "final nail-in-the-coffin for the 'no set of facts' standard" set forth in <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957),[2] that applied to federal complaints before <u>Twombly</u>.  <u>Fowler</u>, 578 F.3d at 210.  The Third Circuit now requires that a district court must conduct the two-part analysis set forth in <u>Iqbal</u> when presented with a motion to dismiss:

> First, the factual and legal elements of a claim should be separated.  The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [<u>Iqbal</u>, 129 S.Ct. at 1949-50<u>]</u>.

---

[2]  In <u>Conley</u>, as stated above, a district court was permitted to summarily dismiss a complaint for failure to state a claim only if "it appear[ed] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.  <u>Id</u>., 355 U.S. at 45-46.  Under this "no set of facts" standard, a complaint could effectively survive a motion to dismiss so long as it contained a bare recitation of the claim's legal elements.

Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." [Id.]  In other words, a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to "show" such an entitlement with its facts.  See Phillips, 515 F.3d at 234-35.  As the Supreme Court instructed in Iqbal, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show [n]'-'that the pleader is entitled to relief.'"  Iqbal, [129 S.Ct. at 1949-50].  This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

Fowler, 578 F.3d at 210-211.

This Court is mindful, however, that the sufficiency of this pro se pleading must be construed liberally in favor of Plaintiff, even after Iqbal.  See Erickson v. Pardus, 551 U.S. 89 (2007).  Moreover, a court should not dismiss a complaint with prejudice for failure to state a claim without granting leave to amend, unless it finds bad faith, undue delay, prejudice or futility. See Grayson v. Mayview State Hosp., 293 F.3d 103, 110-111 (3d Cir. 2002); Shane v. Fauver, 213 F.3d 113, 117 (3d Cir. 2000).

### III.  SECTION 1983 ACTIONS

Belton brings this action pursuant to 42 U.S.C. § 1983. Section 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

> injured in an action at law, suit in equity, or other
> proper proceeding for redress ....

Thus, to state a claim for relief under § 1983, a plaintiff must allege, first, the violation of a right secured by the Constitution or laws of the United States and, second, that the alleged deprivation was committed or caused by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir. 1994).

### IV.   THE NEW JERSEY SEXUALLY VIOLENT PREDATOR ACT

The New Jersey SVPA, N.J.S.A. 30:4-27.24 *et seq.*, provides for the custody, care and treatment of involuntarily committed persons who are deemed to be sexually violent predators ("SVP"). N.J.S.A. 30:4-27.26.  The New Jersey Department of Corrections ("DOC") operates the facilities designated for SVPs, N.J.S.A. 30:4-27.34(a); and the New Jersey Department of Human Services ("DHS") provides for their treatment.  N.J.S.A. 30:4-27.34(b). The SVPA was amended in 2003 to require that regulations be promulgated jointly by the DOC and the DHS, in consultation with of the Attorney General, taking "into consideration the rights of the patients as set forth in section ten of P.L. 1965, c. 59 ©. 30:4-24.2) ... [to] specifically address the differing needs and specific characteristics of, and treatment protocols related to, sexually violent predators."  N.J.S.A. 30:4-27.34(d).

In passing the SVPA, the New Jersey Legislature made specific findings regarding SVPs. N.J.S.A. 30:4-27.25. The Legislature noted that it was necessary to modify the previous civil commitment framework and additionally separate SVPs from other persons who have been civilly committed. Id. The SVPA defines a SVP as:

> ... a person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sexually violent offense, or has been charged with a sexually violent offense but found to be incompetent to stand trial, and suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for control, care and treatment.

N.J.S.A. 30:4-27.26(b).

Those persons committed under the SVPA shall receive annual review hearings. N.J.S.A. 30:4-27.35. A SVP may be released from involuntary civil commitment upon recommendation of the DHS or by the SVP's own petition for discharge. N.J.S.A. 30:4-27.36.

## V.   ANALYSIS

### A.   Transfer to Prison Facility Claim

Belton again seems to reiterate his primary complaint that he has been transferred to a prison facility, as a civilly committed person under the SVPA, and that such placement is unconstitutional where he is subject to the prison policies in place for the orderly operation and security of a prison facility. Belton raised this claim in his first action, Civil No. 10-3071 (SDW). This Court dismissed the claim, with prejudice, in the Opinion and Order issued on November 29, 2010,

13

based on the Supreme Court's ruling in <u>Kansas v. Hendricks</u>, 521 U.S. 346 (1997).

In <u>Kansas v. Hendricks</u>, the Supreme Court examined the conditions of confinement provided by Kansas' Sexually Violent Predator Act.  The Act called for the confinement of sexually violent predators in a secure facility because they were dangerous to the community.  <u>Id</u>., 521 U.S. at 363-64.  Pertinent here, the Supreme Court was aware that the sexually violent predators in Kansas were to be held in a segregated unit within the prison system.  However, the Court noted that the conditions within the unit were essentially the same as conditions for other involuntarily committed persons in mental hospitals.  Moreover, confinement under the Act was not necessarily indefinite in duration, and the Act provided for treatment.  <u>Id</u>., 521 U.S. at 363, 364, 365-368.  Thus, the Supreme Court held that involuntary confinement under Kansas' SVPA was not unconstitutional so long as such civilly-confined persons are segregated from the general prison population and afforded the same status as others who have been civilly committed.  <u>Id</u>., 521 U.S. at 368-69.  <u>See</u> <u>also</u> <u>Seling v. Young</u>, 531 U.S. 250, 261062 (2001)(holding same with respect to the State of Washington's SVPA).

Here, the New Jersey SVPA is essentially the same as the Kansas and Washington SVP statutes that were examined and upheld as constitutional by the Supreme Court in <u>Hendricks</u> and <u>Seling</u>,

respectively.[3]  See Bagarozy v. Goodwin, Civil Action No. 08-468
(SRC), 2008 WL 4416455, *7-8 (D.N.J. Sept. 23, 2008); In re
Commitment of W.Z., 173 N.J. 109, 801 A.2d 205, 211 (2002).
Therefore, this Court finds that Barber's placement and
confinement in a Special Treatment Unit for SVP residents that is
a segregated unit in the East Jersey State Prison, does not, in
and of itself, violate the U.S. Constitution's Due Process Clause
or the Eighth Amendment's prohibition against cruel and unusual
punishment.  Accordingly, Belton's general claim that his
continued confinement in a segregated unit within a prison
facility is unconstitutional must be dismissed for failure to
state a cognizable claim of a constitutional deprivation.

B.  Conditions of Confinement Claim

     Although plaintiff's placement in a segregated unit within a
prison facility is not, in and of itself, a constitutional
violation, Belton makes additional, general allegations
concerning the conditions of confinement at the EJSP facility.
For instance, he complains that he is housed in a prison facility
subject to restrictions.  See Youngberg v. Romeo, 457 U.S. 307,
321-22 (1982)("Persons who have been involuntarily committed are

---

[3]  Recently, the Supreme Court held constitutional under the
Necessary and Proper Clause, a federal statute that allowed a
district court to order the civil commitment of a sexually
dangerous federal prisoner beyond the date the prisoner would
otherwise be released.  United States v. Comstock, No. 08-1224,
__ U.S. __, 130 S.Ct. 1949 (May 17, 2010).  Although these
civilly committed persons remained confined at a federal prison,
namely, FCI Butner, the Court did not address their place of
civil confinement as being unconstitutional.

entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish.").

Generally, the Fourteenth Amendment requires that civilly committed persons not be subjected to conditions that amount to punishment, <u>Bell v. Wolfish</u>, 441 U.S. 520, 536 (1979),[4] within the bounds of professional discretion, <u>Youngberg</u>, 457 U.S. at 321-22.  Specifically, in <u>Youngberg</u>, the Supreme Court held that civilly committed persons do have constitutionally protected interests, but that these rights must be balanced against the reasons put forth by the State for restricting their liberties. <u>Id</u>. at 307.  The Constitution is not concerned with <u>de minimis</u> restrictions on patients' liberties.  <u>Id</u>. at 320.  Moreover, "due process requires that the conditions and duration of confinement [for civilly confined persons] bear some reasonable relation to the purpose for which persons are committed."  <u>Seling</u>, 531 U.S. at 265.  While the nature of an SVP's confinement may factor in this balance of what is reasonable, it is clearly established that the substantive due process protections of the Fourteenth Amendment apply to SVPs. <u>See</u> <u>Andrews v. Neer</u>, 253 F.3d 1052, 1061 (8th Cir. 2001)(applying the Fourteenth Amendment's "objective

---

[4]  In <u>Bell v. Wolfish</u>, the Supreme Court held that whether a condition of confinement of pretrial detainees violated their constitutional rights turns on whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate government purpose.  441 U.S. 520, 535-39, (1979).

reasonableness" standard to excessive force claims brought by civilly committed SVPs).

Belton's main allegation with respect to the conditions of his confinement relates to his contention that he is now housed in a prison facility and has been treated like a prisoner and subjected to prison rules.  For instance, Belton complains that he was subjected to a strip search on one occasion after coming back from an afternoon visit.  He makes a general allegation that the ceilings and toilets leak, that the water causes rashes (although he does not allege that he has suffered a rash) and that there is a bed bug infestation.  He also complains that movement to group sessions are controlled by the prison staff, mail is sent to a different location, and electronic equipment is no longer permitted.

The Third Circuit has held that placement of a civilly committed SVP in segregated confinement does not violate due process unless the deprivation of liberty is in some way extreme. See Deavers v. Santiago, 243 Fed. Appx. 719, 721 (3d Cir. 2007)(applying Sandin v. Conner, 515 U.S. 472 (1995),[5] to segregated confinement of civilly committed SVPs).  See also Thielman v. Leean, 282 F.3d 478 (7th Cir. 2002)(likewise

_____

[5]  In Sandin, the Supreme Court held that there was no cognizable liberty interest in freedom from additional restraint in a prison setting.  See 515 U.S. at 486 ("We hold that [the prisoner's] discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest.").

extending <u>Sandin</u> to civil commitment settings).  Thus, Belton's general allegation that group movement is monitored and restricted, without more, fails to articulate a cognizable claim of constitutional magnitude, in light of <u>Deavers</u>.  Belton fails to allege any facts to show that group movements within the EJSP facility are unduly extreme and unrelated to the purposes for which such restrictions are imposed.

Therefore, with respect to this conditions claim as alleged, this Court finds that Belton has failed to state a cognizable claim.  Given that this is plaintiff's second attempt at raising this claim, and he has failed to allege new or additional facts to sustain a conditions claim, and indeed, has relied on the same factual allegations as asserted previously, which were dismissed without prejudice in Civil No. 10-3071 (SDW), the Court finds no reason or argument by plaintiff that would permit Belton yet another bite at the apple.  Accordingly, the Court is constrained to dismiss this claim with prejudice for failure to state a cognizable claim under § 1983.

Additionally, for the following reasons, this Court finds that Belton's complaints about mail restrictions, strip searches, leaking toilets and ceilings and bed bug infestation, and the confiscation of electronic equipment, are not extreme conditions of plaintiff's confinement as a civilly committed person, and thus, do not violate due process.

1.  *Unlawful Search Claim*

Belton alleges generally that residents are subjected to cell searches and strip searches when they return from visits. In particular, Belton alleges that he was strip searched on November 27, 2010, after returning from an afternoon visit.  He asserts that as a civilly committed person, such searches are unconstitutional and violate his rights under the Fourth Amendment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. CONST. amend. IV.  Reasonableness under the Fourth Amendment "depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 618 (1988)(quoting United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985)).  "Thus, the permissibility of a particular practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Id. at 619 (quotation marks and internal citation omitted).

In Hudson v. Palmer, 468 U.S. 517, 530 (1984), a prisoner argued that a cell search conducted to harass him was unreasonable because a prisoner has a reasonable expectation of privacy not to have his cell, locker, personal effects, person invaded for such a purpose. Id. at 529.  The Supreme Court

rejected the claim because "prisoners have no legitimate expectation of privacy." Id. at 530.  The Court observed that:

> A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order.... [S]ociety would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security.... [I]t is accepted by our society that loss of freedom of choice and privacy are inherent incidents of confinement.

Id. at 527-28 (footnotes, citations and internal quotation marks omitted).  The same conclusion was reached with respect to pretrial detainees other than convicted prisoners.  See Bell v. Wolfish, 441 U.S. 520, 558-560 (1979)(finding that a body cavity searches of pretrial detainees do not violate the Fourth Amendment).[6]

Consequently, involuntarily committed patients and SVPs, like pretrial detainees, are entitled to some protection under the Fourth Amendment, but they do not have an expectation of privacy equal to an individual in society generally.  See Serna

---

[6]  In Bell v. Wolfish, the United States Supreme Court, in determining the constitutionality of post-visitation body cavity searches, held that a reasonableness test should be employed when examining the constitutionality of a search that encroaches upon the personal privacy of an inmate and the integrity of the inmate's body.  In other words, courts must balance the need for the particular search against the invasion of personal rights that the search entails.  Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.  441 U.S. 520, 559 (1979); see also Turner v. Safley, 482 U.S. 78 (1987) (a prison regulation which infringes upon an inmate's constitutionally recognized right is valid only if it is reasonably related to a legitimate penological interest).

v. Goodno, 567 F.3d 944, 948 (8th Cir. 2009)(noting that pretrial detainees are kept in custody because there is cause to believe they are dangerous; similarly, commitment under Minnesota law as a sexually dangerous person requires a finding of dangerousness), cert. denied, 130 S.Ct. 465 (2009); Allison v. Snyder, 332 F.3d 1076-79 (7th Cir. 2003)(SVPs may be subjected to conditions that advance goals such as preventing escape and assuring the safety of others, even though they may not technically be "punished"), cert. denied, 540 U.S. 985 (2003); Aiken v. Nixon, 236 F. Supp.2d 211, 233 (N.D.N.Y. 2002), aff'd 80 Fed. Appx. 146 (2d Cir. 2003); see also, Jennings v. New York State Office of Mental Health, 786 F. Supp. 376, 382, 384 (S.D.N.Y. 1992), aff'd, 977 F.2d 731 (2d Cir. 1992).

Similarly, the United States Court of Appeals for the Ninth Circuit has held that, because SVPs have been civilly committed subsequent to criminal convictions and have been adjudged to pose a danger to the health and safety of others, they are subject to "[l]egitimate, non-punitive government interests" such as "maintaining jail security, and effective management of [the] detention facility." Jones v. Blanas, 393 F.3d 918, 932 (9th Cir. 2004). Thus, the reasonableness of a particular search or seizure is determined by reference to the detention context and is a fact-intensive inquiry. Id.

Here, with respect to his Fourth Amendment claim, Belton's primary argument appears to be that any prison actions that did

not specifically take into account his classification as a SVP is per se a constitutional violation.  Applying the balancing test employed by Wolfish, this Court finds that a general strip search conducted on residents upon returning from a visit is plainly reasonable and does not violate plaintiff's Fourth Amendment rights.  See Semler v. Ludeman, 2010 WL 145275, *19, D. Minn. Jan. 8, 2010)(finding no Fourth Amendment violation where plaintiffs were required to submit to pat searches following gym use and kitchen work assignments that included removal of socks and shoes, opening their mouths, showing their zippers, showing behind their ears and running their fingers through their hair; search was "not highly intrusive" and was "not unlike the scope of searches of the general public at airport security checkpoints).  See also Serna v. Goodno, 567 F.3d 944, 955-56 (upholding reasonableness of a facility-wide visual body cavity search after a cell phone case (cell phones considered contraband) was found, because, while invasive, the searches were conducted privately, safely, and professionally, and the facility was reacting to a recurring problem involving contraband cell phones), cert. denied, 130 S. Ct. 465 (Oct. 20, 2009).

Moreover, there are no allegations that the guards conducted the one strip search of Belton in a menacing or degrading manner. Belton does not allege that there was physical force used or that the search was done in a menacing manner.  See Kitchens v. Mims, 2010 WL 1240980 (E.D.Cal. March 25, 2010).  Furthermore, there is

no allegation or evidence to show that the strip search was conducted solely for punitive purposes.  Rather, it is plain that the search was conducted as a security measure after plaintiff had returned from a visit where he had contact with a visitor from outside the EJSP facility.

Therefore, based on all of these factors, this Court will dismiss Belton's Fourth Amendment unlawful search claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), for failure to state a cognizable claim under § 1983.

2.  *Interference With Mail*

Next, Belton seems to complain that his mail must be sent to Avenel rather than directly to the EJSP unit where he is confined.  The Court perceives this claim as asserting a violation of plaintiff's First Amendment rights.  However, Belton does not indicate that he has not received mail or packages, or that his mail has been opened outside his presence.

As a general rule, inmates have a limited liberty interest in their mail under the First and Fourteenth Amendments.  <u>Jones v. Brown</u>, 461 F.3d 353, 358 (3d Cir. 2006), <u>cert</u>. <u>denied</u>, 549 U.S. 1286 (2007).[7]  However, an inmate's constitutional right to

_____

[7]  In <u>Jones v. Brown</u>, the United States Court of Appeals for the Third Circuit held that the legal mail policy of state prison in opening legal mail outside the presence of the inmate violated the inmate's First Amendment right to freedom of speech, and was not reasonably related to prison's legitimate penological interest in protecting health and safety of prisoners and staff. 461 F.3d at 358.  The Third Circuit also has held that "a pattern and practice of opening properly marked incoming court mail outside an inmate's presence infringes communication protected by

send and receive mail may be restricted for legitimate
penological interests.  See Thornburgh v. Abbott, 490 U.S. 401,
407 (1989); Turner v. Safley, 482 U.S. 78, 89 (1987).  In Turner,
the Supreme Court of the United States found that a prison
regulation infringing on an inmate's constitutional rights is
valid so long as it is reasonably related to a legitimate
penological interest.  Id. at 89.  The Court established a
balancing test pursuant to which courts analyze prohibitions on
prisoners' exercise of their constitutional rights by considering
the following four factors: (1) whether prohibiting an inmate
from exercising a constitutional right is rationally related to a
legitimate governmental interest; (2) whether there are
alternative means of exercising that right; (3) what effect
accommodation of the interest would have on guards, other
inmates, and the allocation of prison resources; and (4) whether
there are ready alternatives available that continue to serve the
prison's interest without impinging constitutional rights.
Turner, 482 U.S. at 89-91.  The Court also recognized that
deference should be given to the decisions of prison

_____

the right to free speech.  Such a practice chills protected
expression and may inhibit the inmate's ability to speak,
protest, and complain openly, directly, and without reservation
with the court." Bieregu v. Reno, 59 F.3d 1445, 1452 (3d Cir.
1995) (applying the Turner analysis), implied overruling on other
grounds recognized in Oliver v. Fauver, 118 F.3d 175, 177-78 (3d
Cir. 1997).  Thus, the assertion that legal mail is intentionally
opened and read, delayed for an inordinate period of time, or
stolen may state a First Amendment claim.  See, e.g., Antonelli
v. Sheahan, 81 F.3d 1422, 1431-32 (7th Cir. 1996); Castillo v.
Cook County Mail Room Dep't, 990 F.2d 304 (7th Cir. 1993).

administrators, especially when those decisions deal with issues of prison safety and security.  <u>Id</u>.

The United States Court of Appeals for the Third Circuit has applied <u>Turner</u> in analyzing constitutional claims by civilly committed SVPs.  <u>See</u> <u>Rivera v. Rogers</u>, 224 Fed. Appx. 148, 2007 WL 934413 (3d Cir. March 29, 2007)(applying <u>Turner</u> in analyzing claims of SVPs that opening of their packages violated their First Amendment rights).  Other courts likewise have applied <u>Turner</u> when analyzing claims brought by civilly committed SVPs alleging First Amendment violations.[8]  <u>See</u> <u>Willis v. Smith</u>, 2005 WL 550528 (N.D. Iowa Feb. 28, 2005)(noting that status of SVPs was substantially similar to that of prisoners and applying <u>Turner</u> to SVP claims concerning mail handling procedures); <u>Ivey v. Mooney</u>, 2008 WL 4527792, at *4 n. 7 (D. Minn. Sept. 30, 2008)(applying <u>Turner</u>, but noting that a civil confinement is significantly different from a criminal confinement); <u>Francis v. Watson</u>, 2006 WL 2716452, at *3 (D.S.C. Sept. 22, 2006)(citing cases that have applied <u>Turner</u> in cases involving civilly confined persons); <u>Marsh v. Liberty Behavioral Health Care, Inc.</u>, 2008 WL 821623, at *5 (M.D. Fla. Mar. 27, 2008), <u>aff'd</u> 330 Fed.

---

[8]  Essentially, the First Amendment analysis under <u>Turner</u> mirrors the due process analysis under <u>Youngberg</u>; in both instances, courts must balance the constitutional interests of confined persons against the legitimate interests of the state-run institution in which they reside.  <u>See</u> <u>Beaulieu v. Ludeman</u>, 2008 WL 2498241, at *20 n. 15 (finding <u>Turner</u> to be consistent with <u>Youngberg</u> because "it will not allow a Program detainee's right to be restricted unless there is a valid institutional reason for doing so").

Appx. 179 (11th Cir. 2009); Beaulieu v. Ludeman, 2008 WL 2498241, at *20 (D. Minn. June 18, 2008).

In Rivera, the Third Circuit affirmed the district court's ruling that a facility housing civilly committed SVPs has a legitimate interest in both the safety of its facility and the rehabilitation of its patients.  Rivera, 224 Fed. Appx. at 151 (citing Waterman v. Farmer, 183 F.3d 208, 215 (3d Cir. 1999)("[I]t is beyond dispute that New Jersey has a legitimate penological interest in rehabilitating its most dangerous and compulsive sex offenders.")).  Specifically, the court upheld as constitutional the STU's policy that allows staff to open packages not marked as "legal mail" to assure that the packages do not contain contraband (i.e., items either harmful to staff and residents, or detrimental to rehabilitation).  The court found that plaintiff was free to send and receive mail so long as the content of his mail was not sexually explicit.  Moreover, the Third Circuit found no error in the district court's conclusion that there were no ready alternatives to mail security and that the STU's policy appeared to be the only viable alternative, thus supporting the reasonableness of the mail policy.  Rivera, 224 Fed. Appx. at 151.

Here, this Court likewise finds that it is beyond dispute that the staff at EJSP, where plaintiff and other SVP residents are newly housed, has a legitimate interest in both the safety of its facility and rehabilitating its patients.  As noted above,

26

these civilly committed persons are convicted sexual predators, which makes safety at EJSP a very important concern.  The staff clearly must determine if any items coming through the mail pose a threat to the safety of the staff or the other residents.  They also must decide if any of the materials passing through the mail could be detrimental to a resident's therapy.  Consequently, as set forth by the Supreme Court and the Third Circuit, the Court must defer to the prison officials when it comes to issues of managing a safe and operational prison facility.  In this case, delivery of letters and packages at the Avenel facility located close by, where the staff is trained with respect to SVP issues unlike the general NJDOC staff at EJSP, assures that harmful materials are not being passed through the mail, but also allows for specialized treatment regarding SVP residents.  This new policy, which appears to be preliminarily instituted because of the recent transfer of the SVP residents to EJSP, clearly bears a rational relationship to both interests discussed above.

Moreover, in his interference with the mail claim, Belton alleges no actual incident of interference with his mail.  Courts have held that a single interference with the delivery of an inmate's personal mail, without more, does not rise to the level of a constitutional deprivation.  Morgan v. Montayne, 516 F.2d 1367 (2d Cir. 1975), cert. denied, 424 U.S. 973 (1976).  Thus, the only complaint seems to be that his mail is sent to another facility instead of EJSP where he now resides.  Belton does not

articulate a claim that prison officials are intentionally
delaying or opening his mail.  Accordingly, this claim will be
dismissed for failure to state a cognizable federal
constitutional deprivation.

   3.  *Confiscation of Electronic Devices*

   Belton also complains about a new policy memo issued on
November 1, 2010 that restricts certain electronic equipment
(memory sticks; flash drives; thumb drives; detachable or
external drives; data storage devices; X-box Elite, Play Station
3 and Wii game systems; and remote controls with digital read out
or viewing screens) for SVP residents in the EJSP STU.  He
complains that anyone in possession of such electronic devices
will have such equipment confiscated in violation of his
constitutional rights.  It would appear that plaintiff is
asserting a deprivation of property claim and/or a First
Amendment violation.

   This Court finds that a First Amendment claim, if asserted,
is governed by the standard in Turner v. Safely, supra, which
sets out the standard for challenges to regulations that restrict
a prisoner's fundamental constitutional rights.  Although the
courts have not defined the contours of a civilly detained
person's right to free speech, Belton's rights are at least co-
extensive with the rights of prisoners with respect to
institutional regulations that curtail First Amendment rights.
E.g., City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239,

28

244 (1983)("[T]he due process rights of a [pretrial detainee or
other persons in state custody] are at least as great as the
Eighth Amendment protections available to a convicted prisoner").
Thus, a Turner analysis is applicable here despite the fact that
plaintiff is not a prisoner.  See e.g., Bell v. Wolfish, 441 U.S.
at 545-46 ("A detainee simply does not possess the full range of
freedoms of an unincarcerated individual" because "[t]he fact of
confinement as well as the legitimate goals and policies" of the
institution limit constitutional rights.); Allison v. Snyder, 332
F.3d 1076, 1079 (7th Cir. 2002)(persons confined as sexually
violent "may be subjected to the ordinary conditions of
confinement").

    In the prison setting, regulations that restrict a
prisoner's access to use and own electronic equipment are "valid
[if they] are reasonably related to legitimate penological
interests." Thornburgh v. Abbott, 490 U.S. 401, 413 (1989)
(citing Turner, 482 U.S. at 89).  Applying the Turner rule to an
institutional setting such as EJSP, institution regulations that
restrict a patient's First Amendment rights are valid if they are
reasonably related to a legitimate institutional interests, such
as maintaining security, preserving internal order and
rehabilitation.  McKune v. Lile, 536 U.S. 24, 36 (2002)
("[R]ehabilitation is a legitimate penological interest that must
be weighed against the exercise of an inmate's liberty."); 
Turner, 482 U.S. at 91 (rehabilitation and maintaining security

are legitimate penological interests); <u>Allison</u>, 332 F.3d at 1079 (preventing escape and assuring safety of others are legitimate institutional interests).

Here, this Court finds that the first <u>Turner</u> factor is satisfied because the EJSP STU new rule prohibiting these delineated electronic devices are reasonably related to the legitimate institutional interests of security and the orderly running of the EJSP. The November 1, 2010 memo regarding the new rule, which was attached by plaintiff to his Complaint, expressly states that security and orderly operation of the facility is the purpose of the rule change. Indeed, this Court finds that EJSP STU has a legitimate interest in maintaining security of its facility by preventing residents from improperly using computers to engage in fraud, extortion and other criminal activity and preventing discord that could occur between residents owning the electronic equipment targeted with those who do not. <u>See</u> <u>Semler v. Ludeman</u>, 2010 WL 145275, *9-16 (D. Minn. Jan. 8, 2010) (institution rules governing media, mail, personal property, telephone access and association between patients confined as sexually violent persons are valid under <u>Turner</u> because they are reasonably related to legitimate security and rehabilitative interests); <u>Spicer v. Richards</u>, 2008 WL 3540182, *7-8 (W.D. Wash. Aug. 11, 2008)(state facility for civil detainee's "ban on the possession of electronic devices is reasonably related to the security and safety risks posed to [its] residents, staff,

visitors, and the public," and therefore not violative of civil
detainee's constitutional rights).  In addition, the EJSP STU has
an interest in promoting rehabilitation and a therapeutic
environment by preventing patients from accessing pornography,
contacting their victims, viewing movies that may reinforce
cognitive distortions or sexual deviance and playing video games
that may encourage anti-social or obsessive behavior.  See
Hedgespeth v. Bartow, 2010 WL 2990897 at *6-7 (W.D. Wisc. July
27, 2010).

Moreover, defendants have a legitimate security interest in
making uniform rules regarding property ownership and media
restrictions to prevent discord, extortion and unauthorized
property exchanges among patients, as well as legitimate security
and rehabilitative interests in keeping potential damaging
materials out of the institution altogether.  See Allison, 332
F.3d at 1079 (security is legitimate institutional interest);
Hedgespeth, 2010 WL 2990897 at *8.

The third Turner factor also weighs heavily in favor of the
defendants' new electronic restrictions.  Allowing residents to
own digital storage devices, video game systems and the other
listed electronic devices would be a security, treatment and
administrative nightmare.  Security staff would need to screen
each resident's electronic equipment for unauthorized content
regularly and frequently.  Additionally, because it is relatively
easy to hide and transfer digital files by these restricted

31

devices, some residents likely would succeed in caching and accessing unlawful or counter-therapeutic data.  Thus, unrestricted access to the internet and video games at EJSP STU likely would interfere with the efforts to treat the patients and operate the facility in a secure and orderly manner.  Hedgespeth, supra.

Finally, this Court notes that Belton has failed to articulate any reason or alternative that would refute the clearly expressed security need for the new restriction on electronic devices.  He simply states a legal claim that his constitutional rights will be violated without any factual support.  Such claim does not pass muster for statement of a claim under the Iqbal standard.

Facilities that house and deal with residents who have been involuntarily committed for sexual disorders are "'volatile' environments whose day-to-day operations cannot be managed from on high."  Thielman v. Leean, 282 F.3d 478, 483 (7th Cir. 2002).  Courts must presume that the judgment exercised by the appropriate professionals in these facilities is reasonable.  Id. (citing Youngberg v. Romeo, 457 U.S. 307, 312-24 (1982) (extending "professional judgment" standard to substantive due process claim brought by involuntarily committed mental patient and noting that such a presumption was "necessary to enable institutions of this type-often, unfortunately, overcrowded and understaffed-to continue to function"); see also Hedgespeth, 2010

32

WL 2990897 at *9.  Accordingly, this Court finds that Belton has
failed to state a claim of constitutional magnitude in this
regard.

Finally, to the extent that plaintiff is raising a
deprivation of property claim, his claim must be dismissed for
failure to state a claim.  The Fourteenth Amendment provides, in
pertinent part here, that the State may not "deprive any person
of life, liberty, or property, without due process of law[.]"
The "due process of law" essentially requires that the government
provide a person notice and opportunity to be heard in connection
with the deprivation of life, liberty or property.  Zappan v.
Pennsylvania Board of Probation and Parole, 152 Fed. Appx. 211,
220 (3d Cir. 2005)("The essential requirements of any procedural
due process claim are notice and the opportunity to be heard.").
Hence, to establish a prima facie case of a procedural due
process violation, a plaintiff must establish: (1) a deprivation
of a constitutionally protected liberty or property interest, (2)
state action, and (3) constitutionally inadequate process.  See
Rusnak v. Williams, 44 Fed. Appx. 555, 558 (3d Cir. 2002)
("Procedural due process claims, to be valid, must allege state
sponsored-deprivation of a protected interest in life, liberty or
property.  If such an interest has been or will be deprived,
procedural due process requires that the governmental unit
provide the individual with notice and a reasonable opportunity
to be heard.")(citation omitted).

33

To have a property interest, Belton must demonstrate "more than an abstract need or desire for it. ... He must, instead, have a legitimate claim of entitlement to it" under state or federal law. Board of Regents v. Roth, 408 U.S. 564, 577 (1972). For present purposes, a procedural due process analysis involves a two step inquiry: the first question to be asked is whether the complaining party has a protected liberty or property interest within the contemplation of the Due Process clause of which he has been deprived and, if so, the second question is whether the process afforded the complaining party to deprive him of that interest comported with constitutional requirements. Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000).

Here, as demonstrated above, the restrictions on electronic devices are neither arbitrary or capricious, but plainly were implemented in order to address the security and operational concerns of a prison facility, which also houses civilly committed sex offenders. Belton has not demonstrated a constitutionally-recognized property interest in the continued possession of unrestricted electronic devices necessary to satisfy the threshold requirement of a deprivation of property interest. See Semler v. Ludeman, 2010 WL 145275, *25 (D. Minn. Jan. 8, 2010).

Furthermore, to the extent that Belton may have electronic equipment confiscated, as alleged (although he does not articulate that he actually possesses these restricted items), he

34

has a post-deprivation remedy.  Property loss caused by the
intentional acts of government officials does not give rise to a
procedural due process claim under § 1983 where a post-
deprivation remedy satisfying minimum procedural due process
requirements is available under state law.  See Parratt v.
Taylor, 451 U.S. 527 (1981) (overruled in part on other grounds
by Daniels v. Williams, 474 U.S. 327 (1986)); see also Zinermon
v. Burch, 494 U.S. 113, 115 (1990); Hudson v. Palmer, 468 U.S.
517 (1984); Holman, 712 F.2d at 856.[9]  The New Jersey Tort Claims
Act ("NJTCA"), N.J. STAT. ANN. § 59:1-1 et seq., provides a post-
deprivation judicial remedy to persons who believe they were
deprived of property at the hands of the State or local
government.  See  Holman, 712 F.2d at 857; Asquith v. Volunteers
of America, 1 F. Supp.2d 405, 419 (D.N.J. 1998), aff'd 186 F.3d
407 (3d Cir. 1999).

Therefore, any deprivation of property claim asserted by
Belton here will be dismissed with prejudice for failure to state
a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

_____

[9]  In Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982), the
Supreme Court explained, however, that post-deprivation remedies
do not satisfy the Due Process Clause if the deprivation of
property is accomplished pursuant to established state procedure
rather than through random, unauthorized action.  455 U.S. at
435-36.  But see Tillman v. Lebanon Co. Correctional Facility,
221 F.3d 410, 421 n.12 (3d. Cir. 2000)(citing United States v.
James Daneil Good Real Property, 510 U.S. 43, 53 (1993))(in
"extraordinary situations" such as routine deduction of fees from
a prisoner's account even without authorization, post-deprivation
remedies may be adequate).

4.   *Unsanitary Conditions*

Belton next generally alleges that his unit has leaking ceilings and toilets, and that the water causes rashes.  He also complains about a bed bug infestation, but admits that extermination services have been contracted on a weekly basis to address and remedy the problem.  He does not contend that these conditions are intended as punishment, or that he has suffered adversely from these alleged conditions.  Based on these general allegations, even if true, the Court finds no atypical or significant deprivation that would rise to the level of a constitutional violation at this time.

C.   Denial of Treatment Claim

Belton also continues to generally assert that his therapy/treatment sessions have been disrupted or denied because of the prison setting and control by NJDOC officials over movement schedules and conduct of the residents in the EJSP-STU. Belton complains that he is confined in an "untherapeutic environment" and that treatment is "futile" under these conditions.  He states that defendant Friedman allegedly admitted that the NJDHS did not have the money to house and treat civilly committed persons properly.  More specifically, Belton alleges that his name was submitted to a test called the "hair scope psychopathy test" and that he has been taken out of his former groups.  Belton also observed the NJDHS staff move their office supplies off ground to another location, leaving plaintiff with no on-site psychiatrist after 4:00 p.m.  Thus, Belton appears to

argue that he is denied the right to adequate treatment and reasonable care applicable to civilly committed SVPs, in violation of the Fourteenth Amendment.

The Fourteenth Amendment to the United States Constitution, § 1, guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law."  This due process guarantee has been interpreted to have both procedural and substantive components, the latter which protects fundamental rights that are so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed."  <u>Palko v. Conn.</u>, 302 U.S. 319, 325 (1937). These fundamental rights include those guaranteed by the Bill of Rights, as well as certain liberty and privacy interests implicitly protected by the Due Process Clause, such as the right to marry.  <u>Washington v. Glucksberg</u>, 521 U.S. 702, 720 (1997). Substantive due process also protects against government conduct that is so egregious that it "shocks the conscience," even where the conduct does not implicate any specific fundamental right. <u>See</u> <u>United States v. Salerno</u>, 481 U.S. 739, 746 (1987).

Laws disturbing fundamental rights receive strict scrutiny and will be upheld if they are "narrowly tailored to serve a compelling state interest."  <u>Reno v. Flores</u>, 507 U.S. 292, 302 (1993).  However, regulations not implicating fundamental rights (in other words, those claims attacking particularly egregious or arbitrary governmental actions) are analyzed under the deferential standard referred to as the rational basis review,

and will generally succeed only if the government action shocks the conscience.  See Glucksberg, 521 U.S. at 728.

With respect to Belton's claim, it appears that he is asserting that he has a fundamental right to adequate treatment as a civilly committed sex offender, and that as a result of the prison setting he is not being afforded adequate treatment.  The Supreme Court established that there exists a constitutionally protected right of mentally retarded persons confined at a state institution to minimally adequate treatment.  Specifically, the Supreme Court held that there is a constitutional right of mentally disabled persons confined at a state institution to "minimally adequate habilitation", self-care treatment or training to the extent necessary to protect their recognized fundamental rights to safety and freedom from physical restraints.  Youngberg, 457 U.S. at 316, 319 and 322.

The Supreme Court further held that, where a fundamental right is at issue, a district court must balance "the liberty of the individual and the demands of an organized society" to determine whether such right has been violated.  Youngberg, 457 U.S. at 320.  Although restrictions burdening a fundamental right generally receive strict scrutiny, in Youngberg, the Supreme Court found that this sort of rigorous analysis would unduly burden the ability of states, specifically their professional employees, to administer mental health institutions.  Id. at 322.  Consequently, the Court concluded that "the Constitution only requires that the courts make certain that professional judgment

was in fact exercised," because "[i]t is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." Id. at 321 (internal quotation and citation omitted).  Thus, a decision, "if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." Id. at 323.

In Leamer v. Fauver, 288 F.3d 532 (3d Cir. 2002), the United States Court of Appeals for the Third Circuit held that New Jersey's unique former statutory scheme for sex offenders that predicated the term of sentence on a prisoner's response to treatment and created a right to treatment created a fundamental and cognizable liberty interest in treatment, for purposes of both procedural and substantive due process analyses.  288 F.3d at 545.  Leamer was not a civilly committed sex offender like plaintiff here.  Rather, Leamer was a convicted sex offender whose confinement and treatment were inextricably linked pursuant to statute.  The sentencing court had classified Leamer as having a "mental aberration" and in need of "specialized treatment," which automatically subjected Leamer to the maximum incarceration permitted by law unless he is cured prior to that point.  Leamer could not reduce his sentence through good behavior credits, parole policies or other credits.  Instead, he could only shorten his incarceration through successful therapy, which was an

"inherent and integral element" of the statutory scheme. Consequently, the Third Circuit found that deprivation of treatment would be a grievous loss not emanating from the sentence.  Leamer, 288 F.3d at 544.

Apart from that recognized in Youngberg to prevent the violation of recognized fundamental rights to safety and freedom from physical restraints, this Court finds the Third Circuit's holding in Leamer to clearly extend to an involuntarily committed sex offender under New Jersey's SVPA.  Like Leamer, the length of Belton's confinement under the SVPA is predicated on his response to treatment.  Indeed, the provisions of the SVPA explicitly recognize New Jersey's obligation to provide treatment to SVPs for their eventual release based on successful therapy.  See N.J.S.A. 30:4-27.32(a)("If the court finds by clear and convincing evidence that the person needs continued involuntary commitment as a sexually violent predator, it shall issue an order authorizing the involuntary commitment of the person to a facility designated for the custody, care and **treatment** of sexually violent predators")(emphasis added); N.J.S.A. 30:4-34(b)("The Division of Mental Health Services in the Department of Human Services shall provide or arrange for treatment for a person committed pursuant to this act.  Such treatment shall be appropriately tailored to address the specific needs of sexually violent predators."); N.J.S.A. 30:4-27.36(a)(At any time during the involuntary commitment of a person under this act, if the person's treatment team determines that the person's mental

condition has so changed that the person is not likely to engage in acts of sexual violence if released, the treatment team shall recommend that the Department of Human Services authorize the person to petition the court for discharge from involuntary commitment status"); see also Kansas v. Hendricks, 521 U.S. 346, 367 (1997)(concluding from similarly-worded provisions of Kansas SVP Act that "the State has a statutory obligation to provide 'care and treatment for [persons adjudged sexually dangerous] designed to effect recovery ....")(alterations in original)(internal citations omitted).

Therefore, based on Youngberg and Leamer, this Court concludes that Belton may have a fundamental liberty interest in treatment, but has not stated a cognizable claim at this time for purposes of both procedural and substantive due process analyses. See Bailey v. Gardebring, 940 F.2d 1150, 1154 (8th Cir. 1991), cert. denied, 503 U.S. 952 (1992)(where the Eighth Circuit noted that Youngberg did not establish a right for the civilly committed to treatment per se; the Supreme Court only "held that the Constitution required only such 'minimally adequate training ... as may be reasonable in light of [the] liberty interest[ ] in safety and freedom from unreasonable restraints.'")(quoting Youngberg, 457 U.S. at 322).  In Bailey, the Eighth Circuit concluded that plaintiff had no right to "psychiatric treatment to overcome a 'sexual offender condition'" because he "was neither in danger during his civil commitment nor was he subject to any restraints beyond the ordinary incidents of any

involuntary confinement." <u>Id</u>. at 1153, 1154.  Citing <u>Bailey</u>, district courts in the Eighth Circuit have since concluded that civilly committed sexual predators have no substantive due process right to mental health treatment, adequate or otherwise. <u>See</u> <u>Semler v. Ludeman</u>, 2010 WL 145275, at *26 (D. Minn. Jan. 8, 2010)("Because this Court has not recognized a constitutional right to effective 'treatment' in the context of civilly committed sex offenders, Plaintiffs [alleging substantive due process violations through ineffective treatment] have failed to allege a due process claim ....")(citing <u>Nicolaison v. Ludeman</u>, 2008 WL 508549, at *8 (D. Minn. Feb. 11, 2008)(finding, in ultimately concluding that involuntarily committed sex offender's right to treatment is not "clearly established" for purposes of 28 U.S.C. § 2254(d)(1), that <u>Youngberg</u> "only recognized a right to 'minimally adequate' treatment that reduces the need for restraints," and not a "comparable right to treatment that facilitates release")).

Indeed, Belton's second Complaint again fails to show any procedural or substantive due process violations to date.  Belton does not demonstrate a categorical denial of therapy and treatment sessions due to the prison setting in which he receives his treatment.  Moreover, there is simply no evidence other than Belton's bald allegation that his treatment may be curtailed as punishment for filing grievances or complaining.  Rather, his complaints more aptly demonstrate his personal dissatisfaction with being in a prison setting, and having group movements

monitored and directed by the NJDOC.  He fails to allege even one instance where his therapy group session was cancelled.  Thus, there simply is no evidence that Belton has been denied therapy sufficient to give rise to a claim of constitutional magnitude.

In Leamer, the Third Circuit, relying on Sandin, found that Leamer would face "significant obstacles" in establishing a procedural due process claim based on his placement on RAP (restricted activities program) status because the mere fact of placement in administrative segregation is not in and of itself enough to implicate a liberty interest.  Leamer, 288 F.3d at 546.  Similarly, in the instant case, although Belton appears to claim that he is segregated from his groups of choice, he does not allege that he has been or will be denied treatment.

The complaint contains no factual allegations of an absolute denial of treatment.  Rather, Belton merely alleges that prison staff regulate movement and conduct searches and other policy measures for the orderly running and security of the EJSP facility as a whole, which Belton feels affects his access to his preferred treatment sessions.  He does not allege that he has been denied treatment altogether.  Further, Belton recites legal conclusions in his complaint about being made to feel like a "prisoner" rather than a civilly committed person rather than allege any facts to support a claim that he has been denied treatment.  Indeed, he seems mostly fixated on the idea of being in a "prison setting" and does not allege any real disruption or interference with his treatment, other than controlled movements

in the EJSP facility, which on its own, does not curtail group therapy.

This Court likewise finds no substantive due process violation at this time.  Substantive due process prevents the government from engaging in conduct that "shocks the conscience," or interferes with rights "implicit in the concept of ordered liberty."  Glucksberg, 521 U.S. at 721.  Under this standard, Defendants' actions in denying Belton his statutory right to treatment will be found unconstitutional under the Fourteenth Amendment if they were so arbitrary or egregious as to shock the conscience.  See Leamer, 288 F.3d at 546-47 (substantive due process claim alleging inadequate treatment for committed sex offender "must focus on the challenged abuse of power by officials in denying [the plaintiff] the treatment regimen that was statutorily mandated and was necessary in order for his condition to improve, and thus for him to advance toward release").

Here, as demonstrated above, defendants have not categorically declined to provide any mental health treatment to Belton.  Thus, this Court cannot readily conclude that Defendants' actions were conscience-shocking and in violation of Belton's substantive due process rights.  Indeed, plaintiff's allegations, as set forth above, are merely conclusory and factually unsubstantiated.  Belton has not shown any disruption of treatment.  Instead, he simply objects to the manner and place in which treatment and sessions are provided.

Thus, the Court concludes that treatment has not been denied to Belton, as alleged because there is no demonstrated interruption of adequate treatment that would rise to the level of a constitutional due process deprivation as alleged.  Further, this Court concludes that the allegations asserted in Belton's second Complaint does not show such egregious conduct or disruption as to render mental treatment at EJSP conscience-shockingly deficient.

Accordingly, based on the facts as alleged in the Complaint, Belton's claim alleging inadequate treatment will be dismissed for failure to state a cognizable claim of a deprivation of a constitutional right.  The Court reiterates the observation that this is Belton's second attempt to state a claim, and he has failed to muster allegations that would support a denial of or inadequate treatment claim.  Indeed, his claim is merely repetitive and the Court finds no reason or argument by plaintiff that would permit plaintiff yet another bite at the apple.  Accordingly, the Court is constrained to dismiss this claim with prejudice for failure to state a cognizable claim under § 1983.

D.   <u>Harassment Claim</u>

Belton further complains that he is being "mentally harassed and degraded" by the correctional officers, principally because they subject him to prison policies.  Belton does not allege how he was allegedly harassed, but it appears that he took offense when he was told that he was being treated like a prisoner and subject to prison rules.

Allegations of verbal abuse or threats, unaccompanied by injury or damage, are not cognizable under § 1983, regardless of whether the inmate is a pretrial detainee or sentenced prisoner. See Jean-Laurent v. Wilkerson, 438 F. Supp.2d 318, 324-25 (S.D.N.Y. 2006)(pretrial detainee's claim of verbal abuse not cognizable under § 1983 because verbal intimidation did not rise to the level of a constitutional violation); Ramirez v. Holmes, 921 F. Supp. 204, 210 (S.D.N.Y. 1996)(threats and verbal harassment without physical injury or damage not cognizable in claim filed by sentenced inmate under § 1983). See also Price v. Lighthart, 2010 WL 1741385 (W.D. Mich. Apr. 28, 2010); Glenn v. Hayman, 2007 WL 894213, *10 (D.N.J. Mar. 21, 2007); Stepney v. Gilliard, 2005 WL 3338370 (D.N.J. Dec. 8, 2005)("[V]erbal harassment and taunting is neither 'sufficiently serious' nor 'an unnecessary and wanton infliction of pain' under the common meaning of those terms. 'Verbal harassment or profanity alone ... no matter how inappropriate, unprofessional, or reprehensible it might seem,' does not constitute the violation of any federally protected right and therefore is not actionable under [Section] 1983") (quoting Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998), and citing Collins v. Graham, 377 F. Supp.2d 241, 244 (D.Me. 2005)). See also Moore v. Morris, 116 Fed. Appx. 203, 205 (10th Cir. 2004)(mere verbal harassment does not give rise to a constitutional violation, even if it is inexcusable and offensive, it does not establish liability under section 1983), cert. denied, 544 U.S. 925 (2005); Collins v. Cundy, 603 F.2d

825, 827 (10th Cir. 1979) (dismissing prisoner's claim that defendant laughed at prisoner and threatened to hang him); Prisoners' Legal Ass'n v. Roberson, 822 F. Supp. 185, 187-89 (D.N.J. 1993)); Abuhouran v. Acker, 2005 WL 1532496 (E.D. Pa. June 29, 2005)("It is well established ... that ... verbal harassment, ... standing alone, do[es] not state a constitutional claim")(citing Dewalt v. Carter, 224 F.3d 607, 612 (7th Cir. 1999); Williams v. Bramer, 180 F.3d 699, 706 (5th Cir. 1999); Maclean v. Secor, 876 F. Supp. 695, 698 (E.D.Pa. 1995)).  See also Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987) (holding that verbal harassment and abuse are not recoverable under § 1983); Patton v. Przybylski, 822 F.2d 697, 700 (7th Cir. 1987)(holding that racially derogatory remarks, although "unprofessional and inexcusable," are not "a deprivation of liberty within the meaning of the due process clause").

Here, Belton does not allege an accompanying violation that might allow the unidentified verbal harassment to state a separate due process violation or equal protection claim.  At most, Belton alleges that he was humiliated and made to feel like a prisoner, causing him to be "mentally humiliated and degraded" as a result of the unarticulated harassment.  These general allegations of "injury" are nothing more than the mere recitation of a legal conclusion without factual allegations sufficient at this time to support a claim that the defendants were verbally harassing plaintiff as a form of punishment.  Consequently, because the alleged verbal harassment of Belton was not

47

accompanied by any injurious actions - or physical actions of any kind - by the correction officials, Belton fails to state a cognizable § 1983 claim for a violation of his Fourteenth Amendment due process or Fourteenth Amendment equal protection rights, and his claim will be dismissed accordingly.

V.   <u>CONCLUSION</u>

For the reasons set forth above, plaintiff's Complaint will be dismissed with prejudice, in its entirety as against all named defendants, for failure to state a claim, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  An appropriate order follows.

<u>S/SUSAN D. WIGENTON</u>
United States District Judge